UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOSEPH NICE, *et al.,* | ) | CASE NO.  5:21-cv-1887 |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) |  |
|  | ) |  |
| CITY OF AKRON, *et al.,* | ) | **MEMORANDUM OPINION** |
|  | ) | **AND ORDER** |
| Defendants. | ) |  |

Joseph Nice ("Plaintiff") and his company, Metro ACC LLC ("Metro"), filed suit against the City of Akron and a number of public employees.  (Doc. No. 1-1 at ¶¶ 1, 2, & 16.)  The claims arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") and Ohio law.

Two attorneys named as defendants – prosecutor Joseph Miller and public defender Noah Munyer – each filed a motion under Fed. R. Civ. P. 12.  (*See* Doc. Nos. 10 & 18.)  Plaintiffs opposed both motions (Doc. No. 15 & 21), and the movants replied (Doc. Nos. 16 & 22.)  For the following reasons, those motions are GRANTED.

I.  **Facts**

The following facts were alleged in the Complaint, and those are presumed true for purposes of resolving the defendants' motions to dismiss.  *See* Part II.A.

A.  **Defendants**

In addition to the City of Akron, the Complaint named multiple individual defendants employed by Akron or Summit County.  Those public officials are listed here alphabetically.

| Name | Position | Complaint Paragraphs |
|------|----------|----------------------|
| Kenneth Ball | Managing police officer | 6, 46, 60 |
| Charles "Charlie" Brown | Deputy Mayor | 4, 29 |
| Pam Brown | Detective | 10, 23-24, 31-34 |
| Dan Horrigan | Mayor | 3, 60 |
| Joseph Miller | Prosecutor | 9, 63-64, 66 |
| Noah Munyer | Public defender | 8, 38, 42, 50-56, 63-66 |
| Melissa Schnee | Managing police officer | 7 |
| Brian Simcox | Police officer | 5, 23 |
| Phil Young | Independent police auditor | 11, 30 |

(Doc. No. 1-1.)

### B. Prosecution of Plaintiff

Plaintiff is the nephew of James Nice, a former Akron police chief. (Doc. No. 1-1 at ¶¶ 1 & 15.) James Nice resigned as chief in August 2017 and was investigated for alleged abuse of his position. (*Id*. at ¶¶ 45-48.)

Plaintiff owned and operated Metro, a used car dealership. (*Id*. at ¶¶ 2 & 16.) In January 2017, Plaintiff went to an inpatient rehab facility. (*Id*. at ¶ 19.) While he was being treated there, his uncle and other Akron officials schemed to defraud and defame Plaintiff and Metro. (*Id*. at ¶ 20.)

In February 2017, Plaintiff was arrested for theft by deception in relation to alleged fraudulent car titles. (*Id*. at ¶¶ 21 & 26.) On April 12, 2017, he was indicted in Summit County on charges of theft, auto title forgery, and evidence tampering. (*Id*. at ¶¶ 25-26.)

Initially, Plaintiff averred that his uncle, the former police chief, spearheaded the scheme.

(*Id.* at ¶¶ 20-22, 25, & 28.)  The Complaint also alleged that the defendants instituted an investigation and then charged Plaintiff to cover up police misconduct.  (*Id.* at ¶ 57.)  Further still into the Complaint, Plaintiff shifted theories to contend that all the defendants investigated and charged him because they were adverse to the former police chief and wanted to punish his nephew "to gain an advantage against James Nice."  (*Id.* at ¶¶ 58 & 60.)  Plaintiff also asserted that he was targeted because he once accused some unnamed professional athlete of sexual abuse.  (*Id.* at ¶¶ 61-62.)[1]

Elsewhere the plaintiffs alleged: "Some of the defendants initially believed the charges to be true."  (*Id.* at ¶ 27.)

> The defendants subsequently became aware that the allegations of criminal conduct against [P]laintiff were untrue and false but continued to maintain the claims in effort to put pressure on [P]laintiff to provide information regarding James Nice.
>
> The defendants and James Nice wrongfully and illegally withheld evidence related to the charges against the [P]laintiff.

(*Id.* at ¶¶ 35-36.)  The thesis of the Complaint was that the "criminal prosecution against Plaintiff Nice was a legal proceeding that initially was set in motion in proper form and with probable cause albeit based upon false information and lies."  (*Id.* at ¶ 90.)

The Complaint referred to distinct types of property taken from each of the plaintiffs. Those allegations are recounted below.

### C.  Plaintiff's Personal Property Taken

"During the investigation into Plaintiff Joe Nice by Defendants, the investigators confiscated over $100,000 worth of property from [P]laintiff including but not limited to financial records, business records, computers, antiques, cars, boats, and a firearm.  Defendants

---

[1] It is not alleged whether Plaintiff meant that he was the victim or that he was a whistleblower for someone else abused by an athlete. (*Id.* at ¶¶ 61-62.)

have refused to return plaintiff's property."  (*Id.* at ¶¶ 40-41.)

Although the Complaint did not specify the exact date(s) of those seizures, the Complaint provided a range.  The investigation and alleged scheme began by January 2017, culminating in an arrest in February 2017, and a grand jury indictment on April 12, 2017.  (*Id.* at ¶¶ 19-21 & 25.)  Plaintiff's criminal trial was scheduled for August 14, 2017.  (*Id.* at ¶ 43.)  Trial was continued, and the case was transferred out of the Summit County prosecutor's office on August 30, 2017.  (*Id.* at ¶¶ 44, 47, & 48.)  There was no allegation that Cuyahoga County officials seized the property; rather, the Complaint alleged that the seizure(s) occurred during the investigation handled by the defendants from Akron and Summit County named in this action. (*See id.* at ¶ 40.)

The Complaint thus confirmed that Plaintiff's personal property was seized sometime prior to August 30, 2017.

### D.  Metro's Assets Taken

Sometime in early 2017, the defendants unlawfully transferred titles of around 40 automobiles owned by Metro.  (*Id.* at ¶¶ 22-24.)  The Complaint is not clear on precisely what entity or persons received the car titles or who holds those titles today.  (*Compare id.* at ¶ 22 *with* ¶ 23.)

Defendant Pam Brown was assigned to investigate the car titles transferred and taken from Metro.  (*Id.* at ¶ 31.)  In May 2017, at the Summit County title bureau, Pam Brown told Plaintiff that she would ignore pursuing those who took or received Metro's car titles – unless Plaintiff agreed to plead guilty in his own criminal case.  (*Id.* at ¶ 32.)  "No charges were ever filed against those responsible per Pam Brown's promise."  (*Id.* at ¶ 33.)  She later threatened an elderly employee of Metro with criminal charges – again, unless Plaintiff accepted a plea

bargain.  (*Id.* at ¶ 34.)  Pam Brown also allegedly revealed that it was *she* who transferred at least one of Metro's car titles – to a woman allegedly having an affair with Akron police officer Brian Simcox.  (*Id.* at ¶ 23.)  Pam Brown threatened that if Plaintiff "tried to get the car back he would suffer grave consequences."  (*Id.* at ¶ 24.)

The Complaint thus confirmed that Metro's assets were transferred and taken in or before May 2017, when Pam Brown was assigned to investigate the matter.

### E.  Plaintiff Reports the Defendants

In May 2017, Plaintiff spoke with Akron's deputy mayor Charles Brown as well as an independent police auditor named Phil Young to report "his allegations of criminal activity by the other defendants."  (*Id.* at ¶¶ 29 & 30.)  Brown suggested that this might be worth raising with a friend of his in the FBI, whereas Young rebuffed Plaintiff.  (*Id.*)  Also in May 2017 came the alleged revelations and threats from Pam Brown, as discussed above.  (*Id.* at ¶¶ 22-24 & 32-34.)

### F.  Criminal Case Against Plaintiff Dropped

On August 30, 2017, the criminal case against Plaintiff was transferred out of the Summit County court and prosecutors' office, and the matter was reassigned to Cuyahoga County.  (*Id.* at ¶¶ 47-48.)  In September 2017, prosecutors there dismissed the charges against Plaintiff.  (*Id.* at ¶¶ 49-50 & 52-54.)

### G.  Claims as to the Prosecutor

According to the Complaint, Defendant Joseph Miller "at all relevant times was acting in individual and/or official capacity as a Prosecuting Attorney" in Summit County, Ohio.  (Doc. No. 1-1 at ¶¶ 9 & 25.)  The Complaint never alleged an illegal act done personally by Miller. The only specific mention of Miller was that Miller was threatened (purportedly by public

defender Munyer) with exposure of an audio recording of police chief Nice – *i.e.*, unless the charges against Plaintiff (the nephew) were dropped.  (*Id.* at ¶¶ 63-66.)

The Complaint ascribed malfeasance to the prosecutor's office, which presumably referred to Summit County prosecutors.  (*E.g., id.* at ¶¶ 21, 25, 33, 35, 47, & 57-62.)  However, on August 30, 2017, the prosecution of Plaintiff was transferred to and handled by Cuyahoga County prosecutors.  (*Id.* at ¶ 47.)  Then in September 2017, all charges against Plaintiff were dropped and dismissed.  (*Id.* at ¶¶ 53-54.)

There was no allegation indicating that Miller was personally active or responsible for purported scheming against the plaintiffs.  (*See id.*)  Miller's only alleged personal role was *being told* that Plaintiff or his public defender would release audio of the former chief unless the criminal charges against Plaintiff were dropped.  (*Id.* at ¶¶ 63-66.)

### H.  Claims as to the Public Defender

Although public defender Noah Munyer ("Munyer") successfully represented him, Plaintiff sued Munyer (along with the other defendants).  (Doc. No. 1-1 at ¶¶ 8 & 53-56.)  The Complaint accused Munyer of blackmailing the prosecutor – albeit in order to have criminal charges against Plaintiff dropped.  (*Id.* at ¶ 66.)  Plaintiff alleged that his public defender threatened to release an audio recording of his uncle, former police chief Nice.  (*Id.* at ¶¶ 63-66.)

Elsewhere in the Complaint, the plaintiffs alleged on information or belief that Munyer provided privileged information to the other defendants "in order to resolve his own personal issues."  (*Id.* at ¶ 51.)  The meaning or basis of this accusation was not pled.  The Complaint acknowledged that the criminal charges against Plaintiff were dropped, and then those charges were expunged from Summit County's clerk website docket.  (*Id.* at ¶¶ 53-56.)

Munyer filed in this Court both an Answer and a Counterclaim.  The latter seeks to

recover legal costs Munyer incurred in defending this case, which he calls frivolous. (Doc. No. 9 at PageID# 80-83.)

## II. The Parties' Contentions

Both Miller and Munyer filed their own dispositive motions challenging the Complaint on its face.

### A. Miller's Motion

Miller moved pursuant to Rule 12(b)(6). (Doc. No. 10.) He argued that he is entitled to absolute immunity as a prosecutor. (Doc. No. 10 at PageID# 89-90.) He pointed out that "Nice lumps all of the defendants together without attempting to identify each defendant's role in the supposed scheme to defraud and damage him." (*Id.* at PageID# 86.)

> In the case where Nice was indicted by the Grand Jury, Miller became the prosecutor based on the random assignment of Nice's case to Miller's courtroom/judge. There is no allegation that Miller sought out Nice's case to be assigned to him, nor does Nice allege that Miller had any role in the Grand Jury indictment.

(*Id.*)

> [T]he Summit County Prosecutor's Office requested that the Cuyahoga County Prosecutor assign a special prosecutor to take over the case due to potential conflicts of interest. This re-assignment of the case in its early stage took Miller off the case, which Nice's Complaint seems to concede. Other than being the prosecutor to whom Nice's case was initially assigned, Nice sets forth no factual allegations as to how Miller was allegedly involved in a conspiracy to defraud and damage him.

(*Id.* at PageID# 87 (citation omitted).) "Without specific factual allegations that Miller was acting outside the scope of his official duties, Miller must be presumed to have been acting within the scope of his official duties as a prosecutor." (*Id.* at PageID# 88.)

In response, the plaintiffs argued that their claims are timely and sufficiently alleged under RICO law. However, the plaintiffs did not argue that Miller is not protected by absolute immunity. (Doc. No. 15 at PageID# 129-133.) The issue of prosecutorial immunity was not

raised in the plaintiffs' opposition brief.  (*See id.* at PageID# 119 (confirming that Doc. No. 15 was plaintiffs' opposition to Miller's motion).)  In the alternative, plaintiffs sought to amend their complaint to assert additional factual allegations.  (*Id.* at PageID# 133.)

### B.  Munyer's Motion

Munyer filed a motion for judgment on the pleadings pursuant to Rule 12(c).  (Doc. No. 18.)  The plaintiffs responded (Doc. No. 21), and Munyer replied (Doc. No. 22).

Munyer reasoned that because he served as criminal defense counsel, all claims against him sound in legal malpractice.  (Doc. No. 18 at PageID# 150 & 154-56.)  In addition, Munyer argued why the allegations failed to meet the elements of claims under RICO or for abuse of process.  (*Id.* at Page ID# 156-64.)  In the alternative, Munyer moved for a more definite statement in the complaint.  (*Id.* at PageID# 164.)

In response, the plaintiffs noted that Munyer never represented Metro.  (Doc. No. 21 at PageID# 177-78.)  As to Plaintiff, they pointed out that Ohio case law allows for a fraud claim based on an attorney's actions outside his capacity as counsel.  (*Id.* at PageID# 178.)  They further argued that "the defendants, including Muny[e]r, acted in concert to defraud plaintiffs of their property (complaint at para 22-24)."  (*Id.* at PageID# 180.)  The plaintiffs acknowledged that they were not damaged in some distinct manner by Munyer.  (*Id.* at PageID# 181.)  Finally, an abuse of process claim was viable, they explain, because all defendants "were involved in the pursuit of the criminal allegations against Mr. Nice [which] was for an ulterior purpose and that he was damaged."  (*Id.*)  In the alternative, plaintiffs requested leave to amend their complaint.

On reply, Munyer pointed out that the Complaint did not raise a fraud claim.  (Doc. No. 22 at PageID# 184.)  Further, the only allegations particular to Munyer showed that his actions fell directly within the scope of his representation of Plaintiff.  (*Id.*)  Munyer went on to

distinguish his role and the allegations against him from the RICO allegations as to other defendants.  (*Id.* at PageID# 185-88.)  There was no causal relation between his acts and the damage alleged, Munyer argued.  (*See id.*)

## III.  <u>Law and Analysis</u>

### A.  Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

#### 1.  Rule 12(b)(6)

"To survive a motion to dismiss, the pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing *Twombly*, 550 U.S. at 556).  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

"When determining whether [plaintiff's] complaint meets this standard 'we accept as true its factual allegations and draw all reasonable inferences in his favor, but we disregard any legal conclusions.'"  *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020)).  The Court "need not accept as true legal conclusions or unwarranted factual inferences."  *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).  "The plausibility of an inference depends on a host of considerations, including common sense . . . .'"  *Ryan*, 979 F.3d at 524 (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d

502, 504 (6th Cir. 2013)).  "Nor is the Court required to accept as true complaint allegations that

are contradicted by public records and other evidentiary materials of which the Court may take

judicial notice."  *Lawson v. Lynch*, No. 4:15-CV-2140, 2017 WL 979115, at *3 (N.D. Ohio Mar.

14, 2017).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader

is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2) (second alteration in

original)).  In such a case, the plaintiff has not "nudged [its] claims across the line from

conceivable to plausible, [and the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

"[W]hen a complaint adequately states a claim, it may not be dismissed based on a

district court's assessment that the plaintiff will fail to find evidentiary support for his allegations

or prove his claim to the satisfaction of the factfinder."  *Twombly*, 550 U.S. at 563 n.8.  The

function of the Court in ruling on such a motion is not to weigh the evidence, nor to appraise the

credibility of witnesses.  *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995); *Jenkins v. Livonia

Police Dep't*, No. 13-14489, 2016 WL 759338, at *2 (E.D. Mich. Feb. 26, 2016).

### 2.    Rule 12(c)

"The standard of review for a Rule 12(c) motion is the same as for a motion under Rule

12(b)(6) for failure to state a claim upon which relief can be granted."  *Fritz v. Charter Twp. of

Comstock*, 592 F.3d 718, 722 (6th Cir. 2010).  "[T]he inquiry on a motion to dismiss is not

whether Plaintiff will be successful on the merits, but simply whether her pleadings are sufficient

to state a claim upon which relief can be granted."  *Id.* at 726.  "To state a valid claim, a

complaint must contain direct or inferential allegations respecting all the material elements under

some viable legal theory." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 479 F.2d 478, 480 (6th Cir. 1973)). A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

### 3. Pleadings May Bind the Pleader

"Once litigation commences, a party typically is bound by its . . . statement in a pleading[.]" *Borror Prop. Mgmt., LLC v. Oro Karric N., LLC*, 979 F.3d 491, 495 (6th Cir. 2020). The Sixth Circuit "has observed that '[u]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.'" *Ferguson v. Neighborhood Hous. Servs. of Cleveland, Inc.*, 780 F.2d 549, 551 (6th Cir. 1986) (quoting *Brown v. Tenn. Gas Pipeline Co*., 623 F.2d 450, 454 (6th Cir.1980)).

If a plaintiff pleads facts that reveal a defect in her claim or substantiate a defense, then she may plead herself out of federal court. *See Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *Cheatom v. Quicken Loans*, 587 F. App'x 276, 279 (6th Cir. 2014); *Gorman v. Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) ("A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law.").

### B.  Immunity for Miller

"A government officer is entitled to absolute immunity for performing functions 'intimately associated with the judicial phase of the criminal process.' . . . [A] prosecutor is entitled to absolute immunity when he acts 'within the scope of his duties in initiating and pursuing a criminal prosecution.'"  *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) (holding that a state prosecutor had absolute immunity for the initiation and pursuit of a criminal prosecution)); *but see Burns v. Reed,* 500 U.S. 478, 492-93 (1991) (holding that absolute immunity does not extend to prosecutor advising the police on investigative tactics); *Prince v. Hicks*, 198 F.3d 607, 612-13 (6th Cir. 1999).

> Prosecutorial immunity extends to a prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer.  . . . The analytical key to prosecutorial immunity, therefore, is *advocacy* – whether the actions in question are those of an advocate.

*Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (emphasis in original) (quotations and citations omitted); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Manetta v. Macomb Cty. Enf't Team*, 141 F.3d 270, 274 (6th Cir. 1998).

 The determination of whether a defendant is entitled to absolute immunity is a question of law.  *Spurlock v. Thompson*, 330 F.3d 791, 796 (6th Cir. 2003).  This Court will consider "whether the facts alleged by plaintiffs, if proved, would overcome the asserted defenses."  *Id*. (citations omitted).

### 1.      Prosecutorial Function

The plaintiffs pled and thereby admitted that Miller acted at all times as a prosecuting attorney.  (Doc. No. 1-1 at ¶¶ 9, 63, & 66.)  *See Kay v. Minacs Grp. (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014) ("Factual assertions in pleadings . . . unless amended, are considered judicial admissions conclusively binding on the party who made them.") (quotations and

citations omitted).  There was no factual allegation indicating that Miller did anything other than act as a prosecutor.  There was no allegation situating Miller's conduct outside of the criminal judicial process.  There was no allegation indicating that Miller acted in a non-advocacy manner or function.

Miller acted as a prosecutor in connection with Plaintiff's indictment by grand jury and pretrial plea bargaining.  These are classic prosecutorial functions.  *See Spurlock*, 330 F.3d at 797 ("Absolute immunity applies to acts ... includ[ing] the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.") (quotation and citation omitted); *Rouse v. Stacy*, 478 F. App'x 945, 951 (6th Cir. 2012) (finding "it is beyond question that a prosecutor's plea bargaining activities, regardless of motive, warrant absolute immunity").  The Complaint thus confirmed that Miller comes within the scope of absolute immunity afforded to prosecutors.

### 2. Counts One through Four

The Sixth Circuit has extended prosecutorial immunity to civil RICO claims.

> Judges and prosecutors have long been held to be absolutely immune from being sued on account of their judicial or prosecutorial acts.  Section 1983 was not intended to abolish this immunity, and we have been given no reason to suppose that RICO was intended to abolish it either.  It would be anomalous, we think, if officials who are immune from suit for alleged violations of the Constitution itself should be denied immunity from suit for alleged violations of a statute that does not incorporate the Constitution – particularly a statute as amorphous as RICO.

*Cullinan v. Abramson*, 128 F.3d 301, 307-08 (6th Cir. 1997), *cert. denied*, 523 U.S. 1094 (1998). (citations omitted); *see also Doe v. Boland*, 630 F.3d 491, 498 (6th Cir. 2011) ("We reached a similar conclusion in *Cullinan v. Abramson*, which held that the civil RICO statute did not abolish common law absolute immunity for judges and prosecutors.").

As explained previously, the facts alleged situate Miller within the ambit of absolute

immunity. Because this immunity extends to civil RICO claims, Counts One through Four are dismissed as to Miller.

### 3. Count Five

"When faced with a claim of immunity to a supplemental state claim, a federal court must look to the appropriate state law to ascertain the nature of the immunity. " *In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 784-85 (6th Cir. 2017) (citations omitted). Ohio recognizes absolute immunity from civil suit for a prosecutor for activities associated with the judicial phase of the criminal process. *See Willitzer v. McCloud*, 453 N.E.2d 693, 695 (Ohio 1983); *Jopek v. Cleveland*, 2010-Ohio-2356, ¶¶ 20-36 (Ohio Ct. App. 8th Dist. May 27, 2020) (explaining Ohio's statutory and common law approach to prosecutorial immunity).

The Complaint made plain that Miller acted in a prosecutorial capacity, and there was no allegation that Miller acted outside of the scope of his job as a prosecutor. (Doc. No. 1-1 at ¶¶ 9, 63, & 66.) Put another way, the only manner in which Miller conceivably could have "perverted the legal process" as to Plaintiff, would be by affecting the criminal case as its prosecutor. But even if one assumed for sake of argument that Miller did so (despite the absence of fact allegations to support such an inference), that would be conduct as a prosecutor. Count Five against Miller thus is barred by the doctrine of sovereign immunity and/or the doctrine of absolute immunity for prosecutors acting in relation to a criminal judicial proceeding.

Even if immunity did not apply, Count Five against Miller suffered from legal defects. There were no facts specific to Miller that alleged Miller acted with a malicious purpose, in bad faith, or in a wanton or reckless manner. Miller thus would be immune from the abuse-of-process claim under Ohio law. *See Coleman v. Beachwood*, 2009-Ohio-5560, 2009 WL 3387948, at ¶ 54 (8th Dist.).

To the extent the plaintiffs suggested that there was no probable cause to charge Plaintiff

at all – which the Complaint here suggested at, *e.g.,* Paragraphs 18, 20, 21, 25 and 57 – then the abuse of process claim would fail as a matter of law.  *See, e.g., Palivoda v. Felix*, 2011-Ohio-5231, 2011 WL 4790982, at ¶¶ 26-33 (11th Dist).  This also would warrant dismissal of Count Five as to Miller.

Further, because no criminal prosecution was initiated against Metro, the latter has no abuse-of-process claim against Miller.  Finally, none of the property losses alleged (*e.g.,* Metro's car titles and Plaintiff's confiscated personal property) were alleged to have been taken by Miller or orchestrated by Miller.  (*See* Doc. No. 15 at PageID# 122.)  Those were taken by investigators – not Miller.  (*See id.*; Doc. No. 1-1 at ¶¶ 22-23 & 40.)

### 4.  Conclusion

For the reasons above, the claims against Miller are barred by the doctrine of absolute immunity as a matter of law.  Counts One through Five as against Miller are dismissed.  Because Miller is immune from suit, the Court does not reach in this opinion the various additional arguments in his motion regarding the elements of a RICO claim.

### C.  RICO

Counts One through Four of the Complaint are civil RICO claims.

> The civil RICO statute, 18 U.S.C. § 1964(c), creates a cause of action for any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962. And 'by reason of' means the injury must be proximately caused by the RICO violation.  As noted at the outset, plaintiffs asserted violations of § 1962(c) (conducting an enterprise through a pattern of racketeering activity); § 1962(b) (acquiring or controlling an enterprise through a pattern of racketeering activity); and § 1962(d) (conspiring to violate the other provisions of § 1962).

*Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Georgia*, 768 F. App'x 446, 453 (6th Cir. 2019) (quotations and citations omitted).  "[A]n injured party can bring a civil RICO claim

against parties who violate any subsection of § 1962." *Courser v. Mich. H.R.*, 831 F. App'x 161, 185 (6th Cir. 2020); *see also Rotella v. Wood*, 528 U.S. 549, 552 (2000).[2]

Munyer challenged the sufficiency of the allegations as a whole and then raised particular legal arguments that he says warrant dismissal of the RICO claims.  The Court will review those grounds for Munyer's motion as well as the plaintiffs' rejoinders to each.

### 1.    'Shotgun' Pleading

"To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Com. Money Ctr., Inc. v. Illinois Union Ins. Co*., 508 F.3d 327, 336 (6th Cir. 2007).  Munyer argued that the RICO claims fail as a matter of law because the plaintiffs lumped all defendants together in what Munyer calls 'shotgun allegations.'  (Doc. No. 18 at PageID# 156-58.)

The plaintiffs, undeterred by that critique, doubled down on their approach, and responded that they "have alleged viable allegations of Civil Rico violations and an abuse of process against not only defendant Muny[e]r, but against all defendants, to meet the low bar to survive a motion for judgment on the pleadings . . . ."  (Doc. No. 21 at PageID# 177.)  The plaintiffs asserted that they "allege[d] an enterprise consisting of all the defendants, including defendant Muny[e]r."  (*Id.* at PageID# 179.)  "The allegations in plaintiffs' Complaint are the defendants, including defendant Muny[e]r, acted in concert to defraud plaintiffs of their property (complaint at para 22-24). These allegations are sufficient," the plaintiffs insisted.  (*Id.* at PageID# 180; *see also id*. at PageID# 181 ("The Complaint does properly assert RICO allegations against all defendants including Muny[e]r.").)

---

[2] Other Defendants in this case argued that the RICO claims were barred by a four-year statute of limitations.  (*See, e.g.*, Doc. No. 8 at PageID# 58-59.)  Munyer did not discuss timeliness in his Rule 12(c) motion.  (*See* Doc. No. 18.)

Munyer relied on *Kerrigan v. ViSalus, Inc*., 112 F.Supp.3d 580 (E.D. Mich. 2015), which held that—

> 'shotgun' allegations of general misconduct by a group of thirty-one different Defendants are not sufficient to state RICO claims against each of them.  Plaintiffs' imprecise RICO allegations are particularly confusing because it is obvious from Plaintiffs' own narrative that Plaintiffs do not – and cannot – literally mean that *each* Defendant engaged in the alleged acts quoted above.  Indeed, Plaintiffs allege that certain Defendants had relatively limited, if any, involvement in the Alleged RICO Enterprise.

*Id.* at 601 (emphasis in original) (citations omitted).  Other decisions also hold that 'lumping' defendants does not suffice to support a RICO complaint.  For example:

> Plaintiff's allegations have lumped all Defendants together for the purpose of alleging liability which is directly opposed to what is required to successfully plead a RICO claim.  The Court agrees with Defendants that Plaintiff's RICO claims cannot withstand dismissal as the Amended Complaint fails to identify the who, what, when, w[h]ere, or how necessary to plead a predicate act.

*Granger Plastics Co., v. Bluewater ATU LLC*, No. 1:17-CV-00314, 2021 WL 3722759, at *8 (S.D. Ohio Aug. 23, 2021) (quotations and citations omitted).  "A plaintiff 'must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.'"  *Bartlett v. State*, No. 17-2274, 2018 WL 5116347, at *2 (6th Cir. May 9, 2018) (emphasis in original) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)).

In light of these authorities, Munyer argued persuasively that the Complaint alleged—

> that Defendants as a whole engaged in a conspiracy . . . by pursuing an indictment, but at the same allege that Munyer successfully defended Plaintiff Nice against that indictment, and successfully obtained dismissal and expungement of same[.] Plaintiffs have confoundingly implicated Munyer in their general allegations, who, based on Plaintiffs' own narrative, could not plausibly have committed the acts that Plaintiffs allege he did.

(Doc. No. 18 at PageID# 157.)

Here there were two pleading defects in this regard.  First, none of the allegations within the four separate RICO counts included any specification or differentiation among individual

defendants.  Counts One through Four repeatedly refer solely to "all Defendants" with regard to RICO elements.  (*See* Doc. No. 1-1 at ¶¶ 67-88.)  As a result, the Court has no basis to infer that Munyer himself committed predicate acts, created or carried out a criminal enterprise, etc.

Second, none of the general allegations (which are incorporated by reference into each respective count), showed how Munyer worked or plotted with other individual defendants.  As a result, the Court has no plausible basis to ascribe to Munyer culpability for what various other defendants and non-parties are alleged in the Complaint to have done.

Taken as a whole, the allegations here proved dually deficient.  First, one cannot sew together from the facts an actionable RICO enterprise or conspiracy.  The plaintiffs mainly just quoted the legal elements of a RICO claim in Counts One through Four.  (Doc. No. 1-1 at ¶¶ 67-71, 73-76, 78-82 & 84-88.)  "'While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.' *Iqbal*, 556 U.S. at 679. . . . [T]his court's standard of review requires more than the bare assertion of legal conclusions, and the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Bartlett*, 2018 WL 5116347, at *2. "It is clear that the plaintiffs must plead with sufficient particularity each element of a claim brought pursuant to 18 U.S.C. § 1964(c)." *Manning v. Stigger*, 919 F. Supp. 249, 252 (E.D. Ky. 1996); *cf. Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987) ("It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim[.]").

On the other hand, it is nearly impossible to discern the particular roles or actions of each individual defendant.  The Complaint "failed to provide any rational allegations specifying how any wrongdoer has taken actions" to defraud or defame the plaintiffs that can be tied or traced to

Munyer.  *Bartlett v. Kalamazoo Cty. Cmty. Mental Health Bd.*, No. 18-1319, 2018 WL 4492496, at *2 (6th Cir. Aug. 22, 2018); *see also Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984) (holding that dismissal "was correct, since even in its most liberal construction, plaintiff's complaint merely alleged broad conclusory negligence language void of the factual allegations necessary to support a conspiracy theory").

Implicitly, the plaintiffs asked the Court to ascribe to every defendant each proverbial "bad act" on which the Complaint alleged that "all defendants" did this or that.  Such an approach would not examine facts, draw inferences therefrom, and gauge plausibility – as this Court is bound to do.  Instead of facts, this approach would exalt generalizations.  Instead of drawing reasonable inferences, this approach asks the Court to assume anybody and everybody did every single thing that is alleged to have occurred.  The approach also relies on sheer possibility, rather than on some demonstration of plausibility.  Thus, "in many instances, [plaintiffs] merely identified the alleged wrongdoers as 'they' or 'them' instead of specifying how each named defendant violated her rights under federal law."  *Bartlett*, 2018 WL 4492496, at *2.

The plaintiffs here failed to plead distinctly and plausibly with regard to the role or effect of the individual defendants.  Moreover, the Complaint does not contain facts that plausibly render those defendants liable under RICO.

### 2.  Lack of Facts for the RICO Elements

"To state a RICO claim, a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Ouwinga v. Benistar* 419 Plan Servs., Inc.*, 694 F.3d 783, 791 (6th Cir. 2012) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006)).  Although it repeated the legal definition of an 'enterprise,' the Complaint never alleged facts identifying or showing the existence of an enterprise.  In short,

the plaintiffs pled a legal test without facts that plausibly meet that test.  (*See* Doc. No. 1-1 at ¶¶ 67-71.)  Plaintiffs did not allege any particular governmental unit here was the "legal entity" that constituted the purported "enterprise."  *See* 18 U.S.C. § 1961(4).  Further, the facts do not lay out an "association-in-fact" enterprise, which "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).  "An association-in-fact enterprise require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach."  <u>Ouwinga</u>, 694 F.3d at 794 (quotation and citation omitted).  Nothing of the kind was alleged here, which distinguishes this case from the complaint found sufficient in *Ouwinga*.  *See id.* at 794-95.

To be held responsible under RICO, a defendant must have not only participated in the scheme, but must have also participated in the operation or management of the enterprise itself.  *See Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).  The Complaint never identifies the purported enterprise.  More important for present purposes, no fact allegations show Munyer to have acted as manager or operative of *any* enterprise.  Further, is not alleged that Munyer *knowingly* carried out any decision or directive of an enterprise.  *See United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008).

A similar problem inheres for predicate acts.  The hornbook definition is pled, (*see id.* at ¶¶ 74-76), but the Complaint never articulated what plaintiffs contend are predicate acts or acts indicative of a pattern.  This deficiency proves particularly unfair as to a defendant like Munyer, who did not enter Plaintiff's orbit until *after* most of the events that apparently comprise the predicate acts and pattern of activity on which the plaintiffs rely.

The Court uses "apparently" because, again, the Complaint does not indicate how its

facts line up with the law.  Put another way, the Complaint told a story but did not show how the story suffices under RICO.  The plaintiffs' briefs in opposition to the pending motions did not do so, either.  The plaintiffs have not "nudged [their] claims across the line from conceivable to plausible, [and so the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.  The Complaint did not contain fact allegations that showed Munyer was plausibly part of or liable for a criminal enterprise or conspiracy.  Moreover, as discussed next, the few concrete allegations regarding Munyer dispel the notion that he was part of a RICO conspiracy.

### 3.    Allegations Showing Where Munyer Was Not Involved

Some key events of which the plaintiffs were most critical and which allegedly resulted in injustices upon them occurred before Munyer was appointed as the public defender for Plaintiff.

The allegation of a purported criminal conspiracy among Defendants was alleged to have begun in late 2016 or early 2017.  (Doc. No. 1-1 at ¶¶ 17-18.)  The uncle/police chief James Nice allegedly began to scheme while Plaintiff was in rehab beginning in late January 2017.  (*Id.* at ¶¶ 19-20.)  Plaintiff was arrested and charged in February 2017.  (*Id.* at ¶ 21.)  "The defendants instituted an[] investigation and charged plaintiff [ ] with the crimes to cover up police misconduct."  (*Id.* at ¶ 57.)  "Defendants intended and did ruin plaintiffs' reputation by bringing unfounded criminal charges against them."  (*Id.* at ¶ 59.)  "Plaintiff had previously reported allegations of criminal sexual abuse involving an unnamed professional athlete to the Prosecutor's office," and the Complaint alleged that Plaintiff was threatened if he aired those publicly.  (*Id.* at ¶ 61.)  "Defendants['] concerted conspiracy against him was related, in part, to those allegations."  (*Id.* at ¶ 62.)

Munyer was not appointed as Plaintiff's criminal defense counsel until March 2017.  (Doc. No. 11-1 at PageID# 111.)  Plaintiff did not plead anything to support drawing a

reasonable inference that Munyer was involved in any plot against Plaintiff or Metro prior to Munyer's appointment as counsel in March 2017.  Munyer likewise could not reasonably be deemed responsible for the contention "that the criminal charges were false and made up," inasmuch as Munyer's role began after Plaintiff's arrest on such charges.  (Doc. No. 1-1 at ¶ 28.) The Complaint did not allege (or permit a reasonable inference) that Munyer had yet met or heard of Plaintiff, or *vice versa*, when the purported scheme was hatched or when the criminal justice process was initiated against Plaintiff.  (*See id.*)

Also, the plaintiffs acknowledged that Munyer did not act on behalf of Metro.  (Doc. No. 21 at PageID# 172.)  Even after Munyer's appointment, the Complaint made clear that Plaintiff himself handled directly the issue of car titles being taken out of Metro's name.  (Doc. No. 1-1 at ¶¶ 29-33.)  When defendant Pam Brown allegedly threatened Plaintiff, she communicated the threat directly to Plaintiff and to his family friend Karen Hoaglund.  (*Id.* at ¶ 34.)  Those communications were not made via Munyer.  (*See id.* at ¶¶ 32 & 34.)  In sum, there is no basis to infer, and the plaintiffs' papers ruled out the notion, that Munyer was involved with the alleged car title snatching.  (*See id.* at ¶¶ 22-24 & 31-34.)  Instead, the Complaint affirmatively alleged that defendants Pam Brown and Brian Simcox – acting at the behest or direction of the uncle James Nice – were responsible for taking the auto titles.  (*See id.* at ¶¶ 20-24.)  Moreover, the Complaint indicated that this scheme commenced when Plaintiff was in rehab, which began on January 27, 2017.  (*Id.* at ¶¶ 19-20.)  Munyer did not enter the picture until March 2017.  (Doc. No. 11-1 at PageID# 111.)

Similarly, the Complaint did not plausibly allege that Munyer was responsible for taking or keeping Plaintiff's personal property.  Nothing in the Complaint would support such an inference, either.  The Complaint identified who allegedly confiscated Plaintiff's personal

property: criminal investigators.  (Doc. No. 1-1 at ¶ 40.)

In any event, any possible notion that Munyer was somehow acting in concert with the other defendants while representing Plaintiff is foreclosed by allegations in the Complaint. Plaintiff alleged that Munyer threatened to play an audio tape that Plaintiff had of his uncle, police chief Nice, if the prosecutor "did not drop the case against plaintiff."  (*Id.* at ¶¶ 63-66.) According to the Complaint, assistant law director Christopher Reece and chief counsel Brad Gessner both told Plaintiff that Munyer was threatening prosecutor Joe Miller to expose an audio recording of police chief Nice.  (*Id.* at ¶¶ 63, 64, & 66.)  Doing so could have embarrassed the city of Akron and its police department, interfered with plans for the police chief's voluntary resignation, sabotaged the criminal investigation and prosecution of the former chief, *etc*. Munyer's alleged threat tactic, assumed for present purposes to be true, would have placed Munyer squarely at odds with the other defendants named here – not in league with them.

The Complaint elsewhere mentioned cryptically that Munyer disclosed privileged information to other defendants.  (*Id.* at ¶ 51.)  But importantly, Munyer allegedly did so *not* in service of a criminal enterprise or conspiracy to harm Plaintiff or his uncle.  Rather, the Complaint alleged that Munyer did this "to resolve his own personal issues."  (*Id.*)  The allegation here was that Munyer acted out of naked self-interest.  This refutes (not supports) the notion that Munyer was aiding some cabal of conspirators or criminals.  *Cf. Ouwinga,* 694 F.3d at 792 (holding that RICO defendants must have "conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs.").  Again, the Complaint did not contain fact allegations that showed plausibly why Munyer should be deemed a part of or held liable for the purported RICO conspiracy alleged.

### 4.    Conclusion

Because the Complaint did not contain fact allegations that plausibly render Munyer

liable under the civil RICO statute or that plausibly render Munyer responsible for any harm to the plaintiffs, Counts One through Four are dismissed as to Munyer.

### D.  Abuse of Process Claim in Count Five

The Ohio Supreme Court has held that "the three elements of the tort of abuse of process are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St.3d 294, 298.  Federal courts apply those elements.  *See generally Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005).

### 1.      First Element

Plaintiff admitted that some of the defendants believed that the charges against him were true, and that there was probable cause for his prosecution.  (Doc. No. 1-1 at ¶ 27 & 90.) Plaintiff thus adequately alleged the first element.

But Metro did not.  The Complaint did not allege that legal process was initiated against Metro or that Munyer represented Metro.  (*See* Doc. No. 1-1 at ¶ 38.) The personal property allegedly seized during the criminal investigation was described as belonging to Plaintiff Joseph Nice.  (*See id.* at ¶ 40.)  Although the Complaint alleged car titles were taken out of Metro's name, the Complaint did not allege that this occurred pursuant to or as part of the criminal case or other legal proceeding where Munyer was counsel.  (*See id.* at ¶ 21-22.)

The Complaint alleged that detective Pam Brown switched auto title(s) from Metro to a woman in a relationship with police officer Simcox.  (*See id.* at ¶ 23.)  Even assuming that occurred, it was not a legal proceeding set forth properly with probable cause, so the events as described did not constitute abuse of process under Ohio law.  Metro thus did not allege the first

element.

### 2.      Second Element

"[A]n abuse-of-process claim will not survive a motion to dismiss when it is supported only by 'conclusory allegations regarding the defendants' ulterior motives with no facts to support those contentions.'"  *Bickerstaff v. Lucarelli*, 830 F.3d 388, 400 (6th Cir. 2016) (quoting *Hahn v. Star Bank*, 190 F.3d 708, 718 (6th Cir. 1999)).

Again, the only legal process or proceeding targeted in Count Five was against Plaintiff, individually.  (*See* Doc. No. 1-1 at ¶¶ 90-91.)  Because the Complaint alleged no process or proceeding as to Metro, Metro's claim against Munyer in Count Five also fails as a matter of law for failure to make out the second element.

The remainder of the analysis below in this subsection applies to Plaintiff's claim in Count Five and the second element of the Ohio tort alleged.  As was true in *Bickerstaff*, here "the complaint is devoid of facts indicating that [Munyer] acted with an ulterior purpose."  *See* 830 F.3d at 400.  Plaintiff alleged three sorts of conduct by Munyer, yet none of them satisfied the second element.

First, Plaintiff alleged that Munyer encouraged him to accept a plea deal offered in his criminal case.  (Doc. No. 1-1 at ¶ 50.)  Plea negotiation with a prosecutor and making a recommendation to a client are typical functions for defense counsel in a criminal case.  Plea deals certainly are not a perversion of the criminal justice process.  Moreover, Plaintiff admitted that prosecutors offered a plea deal on "severely reduced charges," so there was nothing perverse in Munyer suggesting that his client accept such an offer to eliminate any risk of conviction on a higher charge.  (*See id.* at ¶¶ 49-50.)

Second, Plaintiff alleged that Munyer threatened to play an audio tape that Plaintiff had of his uncle, police chief Nice, if the prosecutor "did not drop the case against plaintiff."  (*Id.* at

¶¶ 63-66.)  Assuming this allegation is true, Plaintiff also admitted that the charges against him were dropped.  (*Id.* at ¶¶ 53-54.)

"In any event, even if one assumes that [Munyer] had 'bad intentions,' [Plaintiff] fails to allege any facts showing that the process itself was perverted."  *See Bickerstaff*, 830 F.3d at 400 (citation omitted).  Even assuming *arguendo* that Munyer engaged in an unusual or aggressive negotiating tactic, Plaintiff pled that doing so was for the purpose of having criminal charges against Plaintiff dismissed.  (*See id.* at ¶ 66.)  Dismissal is what resulted, so there was no perversion of the criminal justice process by Munyer.  "Under the second element, 'there is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.'"  *Hahn*, 190 F.3d at 718 (quoting *Yaklevich* and William L. Prosser & Page Keeton, *The Law of Torts* § 121, at 898 (5th ed. 1984)) (brackets in original)).  Plaintiff thus has not plausibly alleged the second element as to Munyer.

### 3.    Third Element

The Complaint described the abuse of process claim as follows:

90. The criminal prosecution against Plaintiff Nice was a legal proceeding that initially was set in motion in proper form and with probable cause albeit based upon false information and lies.

91. Subsequently that proceeding was perverted to attempt to accomplish an ulterior purpose for which it was not designed.

92. Plaintiff was finally exonerated, and all charges were dismissed but no [*sic*]

93. The media reports of said investigation and prosecution continue to damage Plaintiff on both a personal and a professional level as said damaging information continues to exist on the internet.

94. Plaintiff was damaged as result of the wrongful use of process.

(Doc. No. 1-1 at PageID# 17-18.)

In review of these allegations, Plaintiff failed to allege that "direct damage has resulted from the wrongful use of process." *See Yaklevich*, 68 Ohio St.3d at 298.  Even assuming that the media wrote about the criminal case against Plaintiff in an ungracious fashion, and further assuming that such press was damaging, that was not "direct damage" from the criminal process itself.  Nor would it have been the direct result of Munyer's purported perversion or misuse of the legal process.  Put simply, municipalities, police, prosecutors, and defense attorneys are not liable to a criminal defendant based on how a news reporter describes their work.

### 4.    Conclusion

Because both plaintiffs failed to plead plausibly the three required elements of a claim for abuse-of-process, Count Five against defendant Munyer is dismissed for failure to state a claim upon which relief may be granted.

### E.  Whether Claims Against Munyer Sound in Legal Malpractice

Munyer began his Rule 12(c) motion discussing *NanoLogix, Inc. v. Novak*, No. 4:13-CV-1000, 2015 WL 1400656 (N.D. Ohio Mar. 26, 2015).  (Doc. No. 18 at PageID# 154-56.)  He argued that dismissal of all five counts in this case should follow from *NanoLogix*.  (*Id.*)  Because this was Munyer's lead argument, the Court will address it as an alternative ground.

### 1.    *NanoLogix*

In that case, a client sued its former attorney for alleged misdeeds related to the representation.  *Id.* at *1-3.  The complaint listed several Ohio common law causes of action (breach of contract, fraud, etc.) though *not* legal malpractice.  *See id.* at *5 (collecting authorities).  Under Ohio law, "an action for legal malpractice against an attorney" was subject to a one-year statute of limitations."  Rev. Code § 2305.11(A).  The attorney-defendant in *NanoLogix* argued that the substance of the lawsuit against him amounted to accusations of malpractice.  *Id.* at *3.  He urged that the client-plaintiff had simply costumed and labeled his

claims using other causes of action – all of which had longer limitations periods.  *See id.* at *4

The district court followed decisions where that same tactic had been tried and rebuffed by Ohio state courts.  *Id.* at *5.  Because the client-plaintiff's claims (with one exception) were functionally like malpractice claims, *NanoLogix* held that those were subject to the legal malpractice limitations statute.  As a result, those purported "common law" counts were dismissed as untimely.  *Id.*

### 2.  Munyer's Position

Munyer argued that—

in *NanoLogix*, this Court subsumed all of plaintiff client's claims arising out of defendant attorney's representation of that plaintiff into a single claim for legal malpractice.

This Court must do the same here.  . . . Plaintiffs' allegations arise solely out of Munyer's representation of Plaintiff Nice, and therefore sound in legal malpractice, not RICO or abuse of process or any other lawyer-created claim.

Accordingly, Plaintiffs' RICO and abuse of process claims should be dismissed pursuant to Civil Rule 12(c).

(Doc. No. 18 at PageID# 155 (quotations and citations omitted).)

### 3.  Applying *NanoLogix*

*NanoLogix* addressed the situation where a plaintiff with a time-barred claim relabels that claim using a common law cause of action for which the limitations period has not yet passed. Here, Munyer did not press any limitations defense in his Rule 12(c) motion.

Contrary to Munyer's description, *NanoLogix* did not hold that every common law claim arising out of an attorney-defendant's representation would thereby and for that reason be deemed subsumed by a malpractice claim.  Only claims that accuse the attorney of *professional misconduct* get that treatment, and, even as to those, *NanoLogix* recognized an exception if the attorney engaged in fraudulent acts.  *See* 2015 WL 1400656 at *6.  Munyer never explained why

this Court should treat the RICO claims in Counts One through Four as falling in the 'subsumed by malpractice' rule, rather than the fraud exception.

In any event, this Court does not read *NanoLogix* to reach federal statutory causes of action. *NanoLogix* applied Ohio doctrine culled from state court precedent to dismiss state law causes of action by applying a state statute of limitation. The cases cited in that opinion and in Munyer's motion discuss solely state law claims.[3] There was one exception among those cases that warrants mention here because one federal claim was pled in that case, and the claim happened to be RICO.

In *Dottore v. Vorys, Sater, Seymour & Pease, L.L.P.*, 2014-Ohio-25, the plaintiff sued for legal malpractice, breach of contract, breach of fiduciary duty, promissory estoppel, breach of confidentiality, fraud, civil conspiracy, spoliation of evidence, and RICO violations. 2014 WL 72538, at ¶ 1. Various defendants moved for summary judgment on their limitations defense "with respect to the malpractice, breach-of-contract, breach-of-fiduciary-duty, promissory-estoppel, breach-of-confidentiality, fraud, and civil-conspiracy claims." *Id.* at ¶¶ 25-26. The RICO claim was the subject of a motion for judgment on the pleadings. *Id.* at ¶¶ 25, 28, 92-93, & 96. The trial court granted judgment on the pleadings in favor of defendants on the RICO claim for failure to allege viable predicate acts and enterprise. *Id.* at ¶¶ 29-30 & 98-101. On review, the Ohio Court of Appeals also held that the complaint failed to state a viable RICO claim. *Id.* at ¶¶ 101-123.

Importantly, neither the trial court nor the appellate court in *Dottore* held that a federal

---

[3] *See Muir v. Hadler Real Est. Mgmt. Co.*, 4 Ohio App. 3d 89, 90 (10th Dist. 1982); *Hibbett v. City of Cincinnati*, 4 Ohio App. 3d 128, 129-30 (1st Dist. 1982); *Endicott v. Johrendt*, No. 99AP-935, 2000 WL 796576, at *1 (Ohio Ct. App. 10th Dist. June 22, 2000); *Roberts v. Hutton*, 2003-Ohio-1650, ¶¶ 51-53 (10th Dist.).

RICO claim was indistinguishable from legal malpractice.  Indeed, the defendants in that case originally filed a counterclaim seeking a declaratory judgment "that the Dottore Plaintiffs' claims all sounded in malpractice and were barred under the one-year statute of limitations[.]"  *Id.* at ¶ 24.  Because the trial court ruled in favor of all defendants on other grounds, that counterclaim was voluntarily dismissed.  *Id.* at ¶ 125.

In sum, neither *NanoLogix*, nor *Dottore*, nor  the other cases cited indicate that a federal RICO claim against an attorney could be subsumed by legal malpractice under Ohio law.   This Court is dubious of such an argument because when state and federal laws overlap or conflict, typically it is the former that must give way.  *See* U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). Munyer's position is rejected as to Counts One through Four.

That said, *NanoLogix* does provide persuasive authority with respect to the abuse of process claim in Count Five.  This Court agrees that Plaintiff's Ohio law abuse of process claim in Count Five as to Munyer should be construed as sounding in legal malpractice for purposes of the applicable statute of limitations.  As explained previously, Munyer did not press a timeliness defense in the present motion, so the merits of that defense would be a question for another day. Fed. R. Civ. P. 12(h).  Finally, *NanoLogix* would not preclude Metro's claim in Count Five because Munyer never represented Metro.  (*See* Doc. No. 21 at PageID# 172; Doc. No. 22 at PageID# 185.)

### F.  Munyer's Request for More Definite Statement

In light of the rulings above, Munyer's request in the alternative for an order requiring the plaintiffs to plead with greater particularity is moot.  (*See* Doc. No. 18 at PageID# 164.)  The

request also is untimely.

A party may move for a more definite statement of a complaint; however, "[t]he motion must be made before filing a responsive pleading."  Fed. R. Civ. P. 12(e).  Here, Munyer answered the Complaint on November 1, 2021.  (Doc. No. 11.)  Munyer requested a more definite statement pursuant to Rule 12(e) on January 10, 2022.  (Doc. No. 18 at PageID# 164-65.)  Munyer's untimely request is denied.

### G.  Plaintiffs' Request to Amend the Complaint

Rule 15(a) indicates that leave to file an amended complaint should be "freely" granted "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "A 'bare request' for amendment in an opposition to a motion to dismiss does not constitute a motion to amend," however.  *Justice v. Petersen*, No. 21-5848, 2022 WL 2188451, at *3 (6th Cir. June 17, 2022).

Although leave to amend is generally given, "[a] court need not grant leave to amend . . . where amendment would be 'futile.'"  *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 (6th Cir. 2005) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).  Whether a proposed amendment is "futile" is governed by the standard applicable to a Rule 12(b)(6) motion to dismiss.  *Id.*  A court is within its discretion to refuse amendment and dismiss the complaint if it "concludes that the pleading as amended could not withstand a motion to dismiss."  *Martin v. Associated Truck Lines, Inc*., 801 F.2d 246, 248 (6th Cir. 1986); *see also Hoover v. Langston Equip. Assocs., Inc*., 958 F.2d 742, 745-46 (6th Cir. 1992).

All claims against Miller are barred by the doctrine of absolute immunity.  Amendment of the Complaint would be futile because the claims against Miller would be barred by the plaintiff's pleading admission that Miller was acting at all points in a prosecutorial role.

As for Count Five:  Plaintiff's claim targeting Munyer's professional conduct as criminal

defense attorney would be subject to Ohio's one-year limitations period, and there appears no genuine, plausible way that Plaintiff would overcome that.  Metro admitted in briefing that it was not represented by Munyer, and there is no other allegation tying Munyer to a legal process against Metro.  Amendment of Count Five as to Munyer would be futile.

Regarding the RICO claims in Counts One through Four: Elaborating more facts would not allow the plaintiffs to escape or contradict what they already affirmatively alleged or admitted regarding Munyer.  *See Kay*, 580 F. App'x at 331.  Plaintiff had already been arrested and criminal charged when Munyer was appointed in March 2017 to represent him.  According to the Complaint, those charges had been the byproduct of other defendants' scheme to defraud and defame – which already was underway when Munyer first entered the scene.  Metro's car titles had been transferred away.  Plaintiff pled that he addressed and tried to rectify that situation personally, including by speaking directly (not through Munyer) with certain of the defendants. In short, the plaintiffs pled that the harms here were underway (if not fully felt) when Munyer was appointed.

After Munyer was appointed, the Complaint pled events that were positive developments for Plaintiff (not compensable injuries).  The criminal charges against Plaintiff were dropped. Public record of those charges was expunged.  Maybe, as Plaintiff believes, Munyer used a tactic along the way with an alleged audio recording.  But the Complaint alleged that Munyer raised the audio in exchange for charges against Plaintiff being dropped.  None of this is harm wrought by Munyer upon the plaintiffs, and so further amendments would be futile.

Further, for the reasons discussed in a contemporaneously issued opinion and order in this case, civil RICO claims here were time-barred.  True, Plaintiff apparently was deposed in litigation involving his uncle, which apparently occurred after the rest of the events discussed.

That was civil litigation (not criminal).  It was not a deposition taken in a criminal case where Munyer had been Plaintiff's lawyer.  Compliance with a subpoena is not harm that would support a tort claim, much less a RICO claim.  Sitting for a deposition in 2018 or 2019 would not stretch the accrual date for RICO claims because the plaintiffs knew of and felt the harms here by May 2017.

In any event, Munyer obviously was not the attorney who subpoenaed Plaintiff in connection with former police chief Nice's civil litigation with Akron.  Amendment of the RICO claims against Munyer thus would be futile.

**IV.  <u>Conclusion</u>**

For the reasons stated above, Miller's motion to dismiss is GRANTED.  Munyer's motion for judgment on the pleadings is GRANTED.  Munyer's request for more definite statement is DENIED.  The plaintiffs' general request contained in their opposition briefs for leave to amend the Complaint is DENIED.

**IT IS SO ORDERED.**

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

Date: February 3, 2023