UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH NICE, *et al.,* | ) | |
| | ) | CASE NO.  5:21-cv-1887 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| | ) | |
| CITY OF AKRON, *et al.,* | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Joseph Nice ("Plaintiff") and a used car sales company he owned called Metro ACC LLC ("Metro") filed suit against the City of Akron, Ohio ("Akron") and a number of its public employees.  (Doc. No. 1-1 at ¶¶ 1, 2 & 16.)  The claims arise under The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO") and Ohio law.

The city and its employees jointly filed a motion to dismiss.  (Doc. No. 8.)  The plaintiffs responded to that motion (Doc. No. 15), and the moving defendants replied (Doc. No. 17).  For the following reasons, which focus on the applicable statutes of limitation, the defendants' motion to dismiss is GRANTED.  The plaintiffs' informal request to amend the Complaint is DENIED.

## I.   Facts

The following facts were alleged in the Complaint, and those are presumed true for purposes of resolving the defendants' motion.  *See* Part II.A.

### A.  Defendants

In addition to the City of Akron, the Complaint named multiple individual defendants employed by Akron or Summit County.  Those public officials are listed here alphabetically.

| Name | Position | Complaint Paragraphs |
|------|----------|---------------------|
| Kenneth Ball | Managing police officer | 6, 46, 60 |
| Charles Brown | Deputy Mayor | 4, 29 |
| Pam Brown | Detective | 10, 23-24, 31-34 |
| Dan Horrigan | Mayor | 3 |
| Joseph Miller | Prosecutor | 9, 63-64, 66 |
| Noah Munyer | Public defender | 8, 38, 42, 51-56, 63-66 |
| Melissa Schnee | Managing police officer | 7 |
| Brian Simcox | Police officer | 5, 23 |
| Phil Young | Independent police auditor | 11, 30 |

(Doc. No. 1-1.)

### B.  Prosecution of Plaintiff

Plaintiff is the nephew of James Nice, Akron's former police chief.  (Doc. No. 1-1 at ¶¶ 1 & 15.) James Nice resigned from that position in August 2017 and was investigated for alleged abuse of his position.  (*Id*. at ¶¶ 45-48.)

Plaintiff owned and operated Metro, a used car dealership.  (*Id*. at ¶¶ 2 & 16.)  In January 2017, Plaintiff went to an inpatient rehab facility.  (*Id*. at ¶ 19.)  While he was being treated there, his uncle and other Akron officials schemed to defraud and defame Plaintiff and Metro. (*Id.* at ¶ 20.)

In February 2017, Plaintiff was arrested for theft by deception in relation to alleged fraudulent car titles.  (*Id.* at ¶¶ 21 & 26.)  On April 12, 2017, he was indicted in Summit County on charges of theft, auto title forgery, and evidence tampering.  (*Id.* at ¶¶ 25-26.)

Initially, Plaintiff averred that his uncle, the former police chief, spearheaded the scheme.

(*Id.* at ¶¶ 20-22, 25 & 28.)  The Complaint also alleged that the defendants instituted an investigation and then charged Plaintiff to cover up police misconduct.  (*Id.* at ¶ 57.)  Further still into the Complaint, Plaintiff shifted theories to contend that all the defendants investigated and charged him because they were *adverse* to the former police chief and wanted to punish his nephew "to gain an advantage against James Nice."  (*Id.* at ¶¶ 58 & 60.)  Plaintiff also asserted that he was targeted because he once accused some unnamed professional athlete of sexual abuse.  (*Id.* at ¶¶ 61-62.)[1]

Elsewhere the plaintiffs allege: "Some of the defendants initially believed the charges to be true."  (*Id.* at ¶ 27.)

> The defendants subsequently became aware that the allegations of criminal conduct against [P]laintiff were untrue and false but continued to maintain the claims in effort to put pressure on [P]laintiff to provide information regarding James Nice.

> The defendants and James Nice wrongfully and illegally withheld evidence related to the charges against the [P]laintiff.

(*Id.* at ¶¶ 35-36.)  The thesis of the Complaint is that the "criminal prosecution against Plaintiff Nice was a legal proceeding that initially was set in motion in proper form and with probable cause albeit based upon false information and lies."  (*Id.* at ¶ 90.)

The Complaint refers to distinct types of property taken from each of the plaintiffs. Those allegations are recounted below.

### C.  Plaintiff's Personal Property Taken

"During the investigation into Plaintiff Joe Nice by Defendants, the investigators confiscated over $100,000 worth of property from [P]laintiff including but not limited to financial records, business records, computers, antiques, cars, boats, and a firearm.  Defendants

---

[1] It is not alleged whether Plaintiff meant that he was the victim or that he was a whistleblower for someone else abused by an athlete. (*Id*. at ¶¶ 61-62.)

have refused to return plaintiff's property." (*Id.* at ¶¶ 40-41.)

Although the Complaint does not specify the exact date(s) of those seizures, the Complaint does provide a range.  The investigation and scheming began by January 2017, culminating in an arrest in February 2017, and a grand jury indictment on April 12, 2017.  (*Id.* at ¶¶ 19-21 & 25.)  Plaintiff's criminal trial was scheduled for August 14, 2017.  (*Id.* at ¶ 43.)  Trial was continued, and the case was transferred out of the Summit County prosecutor's office on August 30, 2017.  (*Id.* at ¶¶ 44, 47, & 48.)  There is no allegation that Cuyahoga County officials seized the property; rather, the Complaint alleges that the seizure(s) occurred during the investigation handled by the defendants from Akron and Summit County named in this action. (*See id.* at ¶ 40.)

The Complaint thus confirms that Plaintiff's personal property was seized sometime prior to August 30, 2017.

### D.  Metro's Assets Taken

Sometime in early 2017, the defendants unlawfully transferred titles of around 40 automobiles owned by Metro.  (*Id.* at ¶¶ 22-24.)  The Complaint is not clear on precisely what entity or persons received the car titles or who holds those titles today.  (*Compare id.* at ¶ 22 *with* ¶ 23.)

Defendant Pam Brown was assigned to investigate the car titles transferred and taken from Metro.  (*Id.* at ¶ 31.)  In May 2017, at the Summit County title bureau, Pam Brown allegedly told Plaintiff that she would ignore pursuit of those who took or received Metro's car titles – unless Plaintiff agreed to plead guilty in his own criminal case.  (*Id.* at ¶ 32.)  "No charges were ever filed against those responsible per Pam Brown's promise."  (*Id.* at ¶ 33.)  She later threatened an elderly employee of Metro with criminal charges – again, unless Plaintiff

accepted a plea bargain.  (*Id.* at ¶ 34.)  Pam Brown also allegedly revealed that it was *she* who transferred at least one of Metro's car titles – to a woman allegedly having an affair with Akron police officer Brian Simcox.  (*Id.* at ¶ 23.)  Pam Brown threatened that if Plaintiff "tried to get the car back he would suffer grave consequences."  (*Id.* at ¶ 24.)

The Complaint thus confirms that Metro's assets were transferred or taken in or before May 2017, when Pam Brown was assigned to investigate the matter.

### E.  Plaintiff Reports the Defendants

In May 2017, Plaintiff spoke with Akron's deputy mayor Charles Brown as well as an independent police auditor named Phil Young to report "his allegations of criminal activity by the other defendants."  (*Id.* at ¶¶ 29 & 30.)  Brown suggested that this might be worth raising with a friend of his in the FBI, whereas Young rebuffed Plaintiff.  (*Id.*)  Also in May 2017 came the revelations and threats from Pam Brown, as discussed above.  (*Id.* at ¶¶ 22-24 & 32-34.)

### F.  Criminal Case Against Plaintiff Dropped

On August 30, 2017, the criminal case against Plaintiff was transferred out of the Summit County court and prosecutors' office, and the matter was reassigned to Cuyahoga County.  (*Id.* at ¶¶ 47-48.)  In September 2017, prosecutors there dismissed the charges against Plaintiff.  (*Id.* at ¶¶ 49-50 & 52-54.)

## II.  <u>Law and Analysis</u>

Although the moving defendants raised multiple legal challenges to the RICO claims and Ohio law abuse of process claim, (Doc. No. 8), the Court focuses on a dispositive problem that is common to all five counts in the Complaint.  The claims are time-barred.[2]

---

[2] Defendants Miller (a prosecutor) and Munyer (a public defender) each filed his own Rule 12 motion, and those are addressed in a separate order.  The Miller and Munyer motions did not raise limitations defenses.  (*See* Doc. Nos. 10 & 18.)

### A.  Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  The function of the Court in ruling on such a motion is not to weigh the evidence, nor to appraise the credibility of witnesses.  *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995); *Jenkins v. Livonia Police Dep't*, No. 13-14489, 2016 WL 759338, at *2 (E.D. Mich. Feb. 26, 2016).

 "To survive a motion to dismiss, the pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556); *see also dlhBOWLES, Inc. v. Jiangsu Riying Elecs. Co.*, No. 5:21-CV-170, 2022 WL 36465, at *6 (N.D. Ohio Jan. 3, 2022) (resolving motion to dismiss patent claim).  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory."  *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co*., 508 F.3d 327, 336 (6th Cir. 2007).

"When determining whether [plaintiff's] complaint meets this standard 'we accept as true

its factual allegations and draw all reasonable inferences in his favor, but we disregard any legal conclusions.'"  *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020)); *see also Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (a court "need not accept as true legal conclusions or unwarranted factual inferences").  "The plausibility of an inference depends on a host of considerations, including common sense . . . .'"  *Ryan*, 979 F.3d at 524 (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013)).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2) (second alteration in original)).  In such a case, the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [and the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678-79.

If a plaintiff pleads facts that prove a flaw in the claim or substantiate a defense, she may plead herself out of federal court.  *See Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *Cheatom v. Quicken Loans*, 587 F. App'x 276, 279 (6th Cir. 2014); *Gorman v. Chicago*, 777 F.3d 885, 889 (7th Cir. 2015) ("A complainant can plead himself out of court by including factual allegations that establish that the plaintiff is not entitled to relief as a matter of law.").

### B.  RICO Statute of Limitations

A four-year statute of limitations applies to civil RICO claims.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  "Statutes of limitations are not simply

technicalities.  On the contrary, they have long been respected as fundamental to a well-ordered judicial system."  *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 487 (1980). "By forcing plaintiffs to bring claims sooner, rather than later, statutes of limitations result in witnesses who are more reliable and evidence that is fresher.  As a result, expected judicial error costs go down."  *Solis v. Emery Federal Credit Union*, 459 F.Supp.3d 981, 992 (S.D. Ohio 2020).

### 1.  Accrual of a RICO Civil Cause of Action

"The four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation."  *Sims v. Ohio Cas. Ins. Co*., 151 Fed. App'x 433, 435 (6th Cir. 2005) (citing *Rotella v. Wood*, 528 U.S. 549, 553-55 (2000)); *see also Isaak v. Trumbull Sav. & Loan Co*., 169 F.3d 390, 399 (6th Cir. 1999) ("[T]he running of the statute of limitations begins when a plaintiff is put on inquiry notice – that is, when the plaintiff has been presented with evidence suggesting the possibility of fraud.") (quotations and citation omitted).

In the civil RICO context, the Supreme Court has cautioned against approaches that "permit plaintiffs who know of the defendant's pattern of activity simply to wait, sleeping on their rights, as the pattern continues and treble damages accumulate, perhaps bringing suit only long after the memories of witnesses have faded or evidence is lost."  *Klehr v. A.O. Smith Corp*., 521 U.S. 179, 187 (1997) (quotations and citations omitted).  The better course, "and civil RICO's further purpose [is] encouraging potential private plaintiffs diligently to investigate."  *Id.* "Knowledge of all facts is not required to set off the prescriptive clock.  Thus, the clock begins to tick when a plaintiff senses 'storm warnings,' not when he hears thunder and sees lightning." *Isaak*, 169 F.3d at 399 (quoting *Harner v. Prudential-Bache Sec., Inc.*, 35 F.3d 565, 1994 WL 494871, at *4 (6th Cir. 1994)).

With that doctrinal backdrop in mind, the Court next reviews facts alleged in the Complaint that bear on timeliness.

## 2.  Knowledge of Defendants' Criminality Aimed at the Plaintiffs

The purported pattern of criminal or fraudulent activity described in the Complaint began in 2016 or by late January 2017.  (Doc. No. 1-1 at ¶ 17, 19-20.)  On January 27, 2017, Plaintiff went into rehab and "[a]t that time," his uncle (Akron's former police chief) and other "defendants began a scheme to defraud, wrongfully and maliciously prosecute, defame and damage plaintiff and his business" Metro.  (*Id.* at ¶¶ 19-20.)

The harmful results of the alleged scheme were made manifest to the plaintiffs by the Spring of 2017.  In February 2017, Plaintiff was arrested, and then on April 12, 2017, a grand jury in Summit County indicted him.  (*Id.* at ¶¶ 21 & 25.)  The arrest and indictment centered on charges that Plaintiff forged auto title(s).  (*Id.* at ¶¶ 21, 25, & 26.)  It was alleged that this scheme was spearheaded by the police chief James Nice.  (*Id.* at ¶¶ 20-22.)

Importantly, plaintiffs affirmatively alleged that by May 2017 they were informed and aware of the defendants' criminality targeting plaintiffs.

29. In May of 2017 Plaintiff contacted Defendant Charlie Brown about his allegations of criminal activity by the other defendants. Charlie Brown stated he had a friend in the FBI and he would provide plaintiff with that information.  He never provided plaintiff with that information.

30. In May of 2017 Plaintiff contacted Defendant Phil Young about his allegations of criminal activity by the other defendants.  Plaintiff asked Young to file such complaint. Young stated that he did not believe him and would not pursue it or file such complaint.

31. Defendant Pam Brown was assigned to investigate Plaintiff's claims regarding the improper transfer of titles against Rob Shriver of SSR.  Pam Brown told plaintiff th[at] she would be pursuing felony charge[s] against all persons involved in the theft of plaintiffs' property.

32. Plaintiff met Pam Brown at the Summit Count Title Bureau in May of 2017. She inquired about the status of the criminal case against plaintiff and why he had

not taken a plea deal. Plaintiff stated that he was not going to plea because he was innocent.  Pam Brown told Mr. Nice that if was not willing to play ball then neither was she and she was going to drop the cases against those who had taken Plaintiffs' property.

33. No charges were ever filed against those responsible per Pam Brown's promise.

34. Subsequently, on July 10, 2017 Pam Brown texted Karen Hoaglund an elderly women who was an employee of and mother figure to Joe Nice.  She threatened Karen that if Plaintiff did not cut a deal on his criminal case she was going to charge Karen with multiple felonies and she would go to jail.

(*Id.* at ¶¶ 29-34.)

By May 2017, all of the following allegedly occurred, was known to both plaintiffs, and

was reported by Plaintiff to government officials:

- property belonging to Metro was transferred and taken (*id.* at ¶¶ 22-24 & 31-32);

- the defendants engaged in criminal activity (*id.* at ¶¶ 29-30);

- Plaintiff reported the defendants' malfeasance to Akron's deputy mayor Charles Brown (*id.* at ¶¶ 4 & 29);

- Brown promised to, yet failed to, give Plaintiff the name of a friend Brown allegedly had in the FBI (*id.* at ¶ 29);

- Plaintiff reported the defendants' malfeasance to an independent police auditor Phil Young (*id.* at ¶¶ 11 & 30);

- Young directly refused Plaintiff's request that Young file a complaint addressing the other defendants' criminality (*id.* at ¶ 30);

- Plaintiff reported to a detective in Akron named Pam Brown that other defendants had a role in having auto titles improperly transferred from Metro to another entity called SSR Auctions LLC (*id.* at ¶¶ 22-23 & 31-32);

- Pam Brown admitted to Plaintiff that she herself had participated in taking auto title(s) from Metro, at the behest of an Akron police officer Brian Simcox (*id.* at ¶ 23);

- Pam Brown threatened Plaintiff (*id.* at ¶ 24);

- Pam Brown promised to, yet failed to, pursue felony charges against other defendants involved in the theft of Plaintiff's and Metro's property (*id.* at ¶¶ 31 & 33); and

- Plaintiff's willingness to accept a plea agreement in the pending criminal case against him would be directly related to Pam Brown's willingness to pursue criminal charges against those who took the plaintiffs' property (*id.* at ¶ 32).

This last point was reinforced and sharpened on July 10, 2017, when Pam Brown allegedly threatened Metro's elderly employee.  Brown conveyed that retribution would follow from the government if Plaintiff refused to plea bargain and resolve the criminal case against him.  (*See id.* at ¶ 34.)

    As the above allegations and admissions make plain, in May 2017, both plaintiffs knew or should have known that they were being targeted by collective action on the part of police, prosecutors, and other government actors.  *See Isaak*, 169 F.3d at 399.  Plaintiff had been charged and indicted.  Metro's property had been transferred and taken.  Defendants threatened that if Plaintiff would not plead guilty to a crime, then defendants would not take action against those who took Metro's car titles.  Indeed, Plaintiff admittedly reported to multiple government officials that defendants' alleged criminality had occurred and was aimed at him and his business.  (*See id.* at ¶¶ 29-32.)  The plaintiffs admit that by May 2017 they knew and had conveyed to others (i) what was happening to them and (ii) their opinion that investigation by the FBI and by local independent police auditors was warranted.  (*See id.* at ¶¶ 11, 29 & 30.)

    By May 2017, the claims asserted in Counts One through Four for civil RICO and conspiracy liability accrued.  In other words, the proverbial limitations clock began ticking in May 2017.

That conclusion goes for both plaintiffs. Metro was a limited liability company owned and operated by Plaintiff. (*Id.* at ¶ 2.) Plaintiff was a member, manager, and/or agent of Metro, so his actions and knowledge may be ascribed to and may legally bind Metro. *See generally Lexis Nexis, a Div. of Relx Inc. v. Murrell,* 185 N.E.3d 648, 658-59 (Ohio Ct. App. 2022); *Dart v. Katz*, 2021-Ohio-1429, 2021 WL 1593282, at *9 (Ohio Ct. App. 2021); *Sanders v. Fridd*, 998 N.E.2d 526, 536-37 (Ohio Ct. App. 2013); *Whichard v. Matthews*, 2013-Ohio-1892, 2013 WL 1932909, at *4 (Ohio Ct. App. 2013).

### 3. Plaintiffs' Injury and Damages

The bulk of the purported harm, injuries, and damages alleged in the Complaint were sustained and discovered by May 2017.

Plaintiff was arrested in February 2017 and indicted in April 2017. (Doc. No. 1-1 at ¶¶ 21 & 25.) The injustice and damage from what Plaintiff contends was a dishonest prosecution were sustained by April 2017. The return of an indictment by a grand jury was a public event, and so any reputational harm to Plaintiff was an injury sustained and known by April 2017. The Complaint alleges and acknowledges this very point. (*See id.* at ¶¶ 18 & 59.)

It is plain from the face of the Complaint that the 40 titles to automobiles were transferred away from Metro – and that this was discovered by the plaintiffs – no later than May 2017. That is because the Complaint alleges that in May 2017, Plaintiff had discussions with Pam Brown regarding efforts to recover those assets and to punish those who transferred the titles. (*See id.* at ¶¶ 31-34.)

In May and again on July 10, 2017, Plaintiff and Metro were threatened. As pled, it was made plain by those dates that recovering Metro's assets or punishing the transgressors had been inappropriately tied to Plaintiff's willingness to plead guilty to a criminal charge. (*Id.* at ¶¶ 22-24 & 31-34.) Also, an apparent and purported "conflict of interest" associated with the

defendants' handling of the criminal prosecutions of both Plaintiff and his uncle the former police chief were known and made plain by August 30, 2017 – when the prosecutions of Plaintiff and his uncle were both transferred to Cuyahoga County courts and prosecutors. (*See id.* at ¶¶ 47-48.)[3]

It follows from the face of the Complaint that Plaintiff's personal property was seized prior to August 30, 2017. The Complaint alleges that investigators seized Plaintiff's personal property while the named defendants were running a criminal investigation of Plaintiff. (*Id.* at ¶ 40.) The named defendants (employed by Akron or Summit County) turned matters over to Cuyahoga County prosecutors on August 30, 2017, so that was the latest possible date of the Akron and Summit County named defendants' investigation. (*Id.* at ¶¶ 47-48.) The allegation is that those named defendants obtained and kept the property, so the seizure or taking of personal property and effects plainly occurred prior to August 30, 2017.

Given that Plaintiff was arrested in February 2017, was indicted in April 2017, and lost other property he owned through Metro by or before May 2017, (*id.* at ¶¶ 21, 25 & 31-33), the Court is aware that the personal property seizure likely occurred well prior to August 30, 2017. The Court refers to that latter date, however, because inferences are drawn in a plaintiff's favor on a motion to dismiss. Notwithstanding, Plaintiff is bound by his affirmative allegation that his personal property was taken sometime during the named defendants' investigation, (*id.* at ¶ 40), which ended by August 30, 2017 (*id.* at ¶¶ 47-48).

By May 2017, the bulk of the harm, injury, property deprivation, and damages had been sustained and discovered by the plaintiffs. The claims asserted in Counts One through Four for

---

[3] Former chief Nice was later indicted in Cuyahoga County for misuse of a public database. *State v. James D. Nice*, No. CR-18-624837-A (Cuyahoga Cty.); *see also James Nice v. City of Akron*, No. 18-CV-1565 (N.D. Ohio).

civil RICO and conspiracy liability accrued in May 2017. In other words, the limitations clock was ticking since May 2017.

Drawing inferences permissible from the facts alleged, the personal property was seized from Plaintiff before August 30, 2017. So even if the Court indulged the most generous inferences to treat the date when the personal property of Plaintiff was seized as the pertinent point of accrual of the RICO claims, still the clock was ticking by sometime prior to August 30, 2017.

### 4. The Untimely Complaint

The plaintiffs first filed suit in an Ohio state court on August 31, 2021. The four-year statute of limitations on the civil RICO claims had run by that date.

Recall that by May 2017, Plaintiff had been arrested, indicted, and threatened should he decline to plead guilty. Metro's assets had been taken, and Metro's owner was told point blank that authorities would not pursue charges against the perpetrators – unless Plaintiff 'played ball' and pled guilty in his criminal case. In the Court's view, the limitations period expired in May 2021 – *i.e.*, four years after May 2017.

Even if the Court indulged inferences and theories to look past May 2021 for an expiration date, still the Complaint would be time-barred. Metro's auto titles were taken in or before May 2017. Metro's employee had been threatened on July 10, 2017, when Pam Brown admitted to the employee that she was using threats to pressure Plaintiff to plead guilty. Thus July 10, 2017 was the latest conceivable date that Metro's claims would have accrued.

Plaintiff had been threatened with recrimination in May 2017 if he either (i) tried to recover Metro's automobiles or (ii) declined to plea bargain. Plaintiff's personal property had been seized since *before* August 30, 2017. In sum, the harms were felt, and the properties were taken prior to August 30, 2017.

For both plaintiffs' RICO claims in Counts One through Four, the four-year statute of limitations had expired by August 31, 2021, which is when the plaintiffs here filed suit.

### 5.  Other Events

The Complaint alleges some other events that occurred, but those do not bear on when the plaintiffs were injured or when they discovered such harm.

#### a)  Withheld Evidence

The Complaint alleges that "defendants and James Nice wrongfully and illegally withheld evidence related to the charges against the plaintiff." (Doc. No. 1-1 at ¶ 36.)  These allegations plainly refer to matters that occurred prior to August 30, 2017, as evidenced by two other averments.  First, Plaintiff was indicted in April 2017.  (*Id.* at ¶ 25.)  Moreover, James Nice had resigned as Akron's police chief by late August 2017.  (*Id.* at ¶ 45.)

#### b)  Dropped Criminal Charges

The Complaint alleges that the criminal case against Plaintiff was dismissed, and the charges were dropped by September 2017.  (*Id.* at ¶¶ 53-54.)  Those were not harms.  Those events abated and brought closure to harms that began and were known since Plaintiff's February 2017 arrest and April 2017 indictment.

#### c)  Expungement

Plaintiff notes that the record of his criminal case and criminal charges were expunged from the Summit County court website online public record.  (*Id.* at ¶¶ 55-56.)  Those were not harms.  Expungement is a desirable, beneficial development for a person previously charged with a crime.  *See generally Dayton v. Sheibenberger,* 685 N.E.2d 841, 846 (Ohio Ct. App. 1996).

#### d)  Deposition

Plaintiff points out that he was deposed in connection with litigation involving his uncle.

(*Id.* at ¶ 63.)  If that is so, being subpoenaed to testify is not harm or legally compensable damage.  And Plaintiff may have been called as a witness regarding his uncle even if there had not been an elaborate conspiracy targeting Plaintiff and Metro.

### e)  Attorney Comments

Finally, the Complaint alleges that during or after Plaintiff's deposition, some of the Akron and Summit County attorneys discussed that Plaintiff's public defender Munyer had previously threatened to prosecutor Miller that he would release embarrassing audio of police chief Nice unless the criminal charges against Plaintiff were dropped.  (*Id.* at ¶¶ 63-66.)

Assuming, as the Court must at this stage, that such a comment was made, it occurred prior to August 30, 2017.  The Complaint itself confirms that timing because the recipient of the threat was Miller, a Summit County prosecutor.  (*Id.* at ¶¶ 9, 63, & 66.)  A person who apparently overheard or confirmed this point was Brad Gessner, another Summit County prosecutor.  (*See id.* at ¶ 64.)  By August 30th, those Summit County prosecutors had transferred the James and Joseph Nice matters to Cuyahoga County prosecutors.  (*Id.* at ¶¶ 47-48.)  So, assuming the public defender had made some threat about an audio recording, that would have occurred prior to August 30th, *i.e.*, when Miller and Gessner were still the prosecutors handling the Joseph Nice and James Nice cases.

### f)  Information Learned During the Deposition

Finally, Plaintiff argues that he learned additional facts during his deposition taken in James Nice's civil litigation in 2019.  (Doc. No. 15 at PageID# 129.)  But Plaintiff does not specify precisely what it is he learned or from whom.  Plaintiff does not explain (and the Complaint did not allege) whether any of this information was concealed by defendants.

Moreover, the plaintiffs do not argue (much less show) that whatever was learned during

the 2019 deposition was some distinct injury or some crucial component of a civil RICO claim. The implication from the opposition brief seems to be merely that Plaintiff learned of a few additional anecdotes or details regarding the injuries and issues from back in 2017.  (*See id.*)

However revelatory Plaintiff might view the information gleaned during the 2019 deposition, the critical point is this: it did not start the statute of limitations anew from the moment of that deposition.  Rather, the information bore on alleged bad acts and injuries that dated from 2017 – of which the plaintiffs were aware in general terms since May 2017. Whatever Plaintiff heard during the 2019 deposition should have prompted him to file suit *then* – not wait for two years afterward (which was more than four years after the underlying bad acts and injury).

In short, the various other events mentioned in the Complaint do not change the dates by which the plaintiffs were harmed or by which they knew or should have known of such possible harm.

### 6.  Plaintiffs' Arguments

In their motion, the defendants took the position that the civil RICO claims accrued either in April 2017, when Plaintiff was indicted, or at the latest by May 2017, when Plaintiff reported his accusations to the deputy mayor and independent police auditor.  (Doc. No. 8 at PageID# 58-59.)  The plaintiffs raised several points (addressed below) to defer consideration of or to overcome the statute of limitations.  (Doc. No. 15 at PageID# 125-29.)  After careful consideration, those arguments do not avoid the inherent limitations problem.

### a)  Fact Issues

The plaintiffs begin by urging that when they knew or should have known of their injury is "a factual question that cannot be resolved on a motion to dismiss."  (Doc. No. 15 at PageID# 125.)  But to quote another court recently presented with the same suggestion: "Plaintiffs' . . .

argument is equally unavailing; there is simply no rule preventing a statute of limitations dispute involving a civil RICO claim from being resolved at the pleadings stage." *Baltrusaitis v. International Union*, No. 20-12793, 2022 WL 868423, at *7 (E.D. Mich. Mar. 23, 2022), *appeal filed,* No. 22-1383 (6th Cir.).  *See, e.g., Hoover v. Langston Equip. Assocs., Inc*., 958 F.2d 742, 745 (6th Cir. 1992) ("[T]he [district] court did not err in dismissing the count on grounds that the four year federal statute of limitations for civil RICO actions had expired."); *Roberson v. Medtronic, Inc.*, 494 F.Supp.2d 864, 872 (W.D. Tenn. 2007) (granting a motion to dismiss where the RICO complaint was "filed well beyond the statutory deadline and Plaintiffs have presented no argument as to why the statutory period should commence on a different date or why the statute of limitations should be tolled").

### b)  Correct Legal Test for Accrual of a RICO Claim

The plaintiffs ask this Court to apply a more elaborate legal test for accrual of a RICO claim – *i.e.,* the date on which a plaintiff not only learns of his injury but also learns the source or villain that caused the injury.  (Doc. No. 15 at PageID# 127.)  However, this proposed rule seems inconsistent with the Supreme Court's approach in *Rotella* and the Sixth Circuit's holdings.

"The four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, *that the party was injured* by a RICO violation."  *Hood v. United States Postal Serv*., No. 17-1048, 2017 WL 6988055, at *2 (6th Cir. Oct. 11, 2017) (emphasis added) (quoting *Sims,* 151 Fed. App'x at 435); *see also Isaak*, 169 F.3d at 399 ("[T]he running of the statute of limitations begins when a plaintiff is put on inquiry notice – that is, when the plaintiff has been presented with evidence suggesting the possibility of fraud.") (quotations and citations omitted).  Also, in *Taylor Group v. ANR Storage Co*., 24 F. App'x 319, 325 n.1 (6th Cir. 2001), the Court of Appeals noted that before *Rotella*, this Circuit applied the

'injury and pattern discovery rule' to determine the accrual date for civil RICO claims. The implication of *Taylor Group* was that such an approach would no longer be permissible in light of *Rotella.* Instead, the date of injury would be the sole determinative date for purposes of civil RICO accrual.

> Other district courts have rejected the approach that plaintiffs espouse here:

> Because the RICO Act does not specify a statute of limitations in its text, determining when a civil RICO cause of action accrues can be complicated, and the rules have also evolved over time. Initially, most Courts of Appeals . . . applied an injury and pattern discovery rule whereby the statute of limitations begins to run when the plaintiff knew or should have known that each element of a civil RICO claim existed: the injury, the source of the injury, and the pattern of activities prohibited under RICO causing the injury.

> In *Rotella v. Wood*, however, the Supreme Court rejected this 'injury and pattern discovery rule,' and instead found the applicable test is when a plaintiff knew or should have known of his injury. In other words, the 'discovery of the injury,' not discovery of the other elements of a claim, is what starts the clock.

*Baltrusaitis*, 2022 WL 868423, at *6 (quotations and citations omitted) (citing *Elam v. Aurora Servs. Loan, LLC*, No. 2:17-CV-02188, 2018 WL 2074202, at *4 (W.D. Tenn. May 2, 2018)); *see also Osborn v. Griffin*, 50 F.Supp.3d 772, 806 (E.D. Ky. 2014) ("*Rotella* thus stands for the proposition that a plaintiff need not know all the elements required to bring a civil RICO claim to start the limitations period running.").

### c)     Application of Plaintiffs' Proposed Legal Test

Notably, even cases applying the more elaborate test urged by the plaintiffs here would not save this Complaint from dismissal. The recent decision in *LabMD Inc. v. Boback*, 47 F.4th 164 (3d Cir. 2022) is a good example. There, a medical testing business called LabMD was approached by a cybersecurity firm alerting that patient information from LabMD had leaked to the internet. *Id.* at 171. The cybersecurity firm pitched to be hired by LabMD to secure its systems. *Id.* An FTC investigation of LabMD resulted from the purported data leak. *Id.* 171-72.

Later, public scrutiny caused reputational harm to LabMD's business, which did not survive.  *Id.*
at 172.  LabMD sued the cybersecurity company, which *itself* had breached LabMD's patient
data and leaked it (apparently to create cybersecurity need that this firm later pitched to provide).
*Id.*  In any event, the Third Circuit held that the date of injury was when the FTC *started* its
investigation – not when that ended once it had become clear that LabMD had not been negligent
in allowing a leak of patient data.

> Determining when LabMD knew of its alleged injuries is complicated because the
> extent of the injuries grew over time.  For example, when the FTC launched its
> investigation in 2010, LabMD faced "administrative burdens . . . .  But once the
> FTC filed the enforcement action in 2013, LabMD suffered more severely from
> "adverse publicity" resulting in the loss of "all of [its] insurance coverage" and
> "virtually all of its patients, referral sources, and workforce."
>
> Certainly, LabMD may not have expected that the FTC's initial involvement in
> 2010 would result in the demise of its business.  But [a] cause of action accrues
> even though the full extent of the injury is not then known or predictable.  Were it
> otherwise, the statute would begin to run only after a plaintiff became satisfied
> that [it] had been harmed enough, placing the supposed statute of [limitations] in
> the sole hands of the party seeking relief.  For purposes of assessing the accrual of
> its claims, then, we conclude that LabMD knew of its injuries in 2010, at the
> latest.
>
> LabMD also knew or should have known by 2010 that [the cybersecurity firm]
> was the source of the injuries flowing from the FTC's investigation and
> subsequent enforcement action.  Right from the beginning of the "leak" ordeal,
> LabMD was suspicious of [the cybersecurity firm]. . . . Even if LabMD did not
> have actual knowledge that the FTC had gotten its information . . . from [the
> cybersecurity firm], there were enough "storm warnings" that it should have
> known that [the cybersecurity firm] was the source.

*Id.* at 179-80 (quotations and citations omitted).  Applied here, there are two lessons to be drawn
from *LabMD* and its approach to accrual of a RICO claim.

First, the relevant date of injury in that case was when government investigation or
enforcement proceedings *began*.  For a comparable date in this case one might look to the date of
Plaintiff's arrest or his indictment.  Either way, the injury date for accrual purposes here would
be by April 2017.   (Doc. No. 1-1 at ¶ 25.)  As for Metro, by May 2017, Pam Brown was

assigned to investigate the auto title assets transferred away from Metro – and threatening that she might decline to do so if Plaintiff did not accede to defendants' plea bargain demands.  (*Id.* at ¶ 32.)

Second, when LabMD had reason to be suspicious of the cybersecurity firm, that was enough to trigger inquiry notice – *i.e.,* to put LabMD on notice that it may have been harmed and that the limitations clock was ticking.  Here, the Complaint alleges and admits that by May 2017 Plaintiff suspected that his uncle, the police, prosecutors, Pam Brown, and officer Simcox all had acted in concert to subvert Plaintiff and Metro.  (*See id.* at ¶¶ 21-33.)  Indeed, Plaintiff reported in May 2017 to two different public officials in Akron similar fears, accusations, concerns, and perceived schemes and conspiracies as are described in this lawsuit.  (*Id.* at ¶¶ 29-32.)

To conclude, *LabMD* and the test espoused therein for accrual of a RICO cause of action seem inconsistent with Sixth Circuit's approach.  But even applying the *LabMD* approach here, the RICO claims are untimely.

### d)      Fraudulent Concealment

The plaintiffs cite the legal test whereby a statute of limitations may be tolled if the defendants engaged in fraudulent concealment.  (Doc. No. 15 at PageID# 128.)  For several reasons, that citation is unavailing.

First, there are no facts alleged in the Complaint to make out the elements of fraudulent concealment.

Second, the plaintiffs' opposition did not supply such facts or show how the fraudulent concealment doctrine would apply here.

Third, if Plaintiffs wished to advance a fraudulent concealment theory, then the Complaint would need to satisfy the heightened pleading standard of Rule 9(b) as to that portion

of the pleading.  *See Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 475 (6th Cir. 2013).

The Complaint here would not meet the Rule 9(b) standard, and the plaintiffs do not argue

otherwise.  There are no fact allegations or arguments on brief demonstrating what was

purportedly hidden or diligence on plaintiffs' part to uncover some hidden, unknown matter.

Fourth, the Sixth Circuit has clarified that a plaintiff has an "obligation to plead facts in

avoidance of the statute of limitations defense" when "it is apparent from the face of the

complaint that the time limit for bringing the claim[s] has passed."  *Bishop v. Lucent Techs., Inc*.,

520 F.3d 516, 520 (6th Cir. 2008) (quoting *Hoover v. Langston Equip. Assocs., Inc*., 958 F.2d

742, 744 (6th Cir. 1992)).  There are no facts in the Complaint that make out a discovery rule,

equitable tolling, concealment, or any other basis to deem the Complaint timely.

### 7.  Conclusion

The civil RICO claims in Counts One through Four are dismissed as barred by the statute

of limitations.

### C.  Abuse of Process under Ohio Law

The Ohio Supreme Court has held that "an action for abuse of process is governed by the

four-year limitations period," where the defendant was a private party.  *Yaklevich v. Kemp,*

*Schaeffer & Rowe Co., L.P.A.*, 626 N.E.2d 115, 116 (Ohio 1994) (syllabus the court).  The Ohio

Court of Appeals has since held that—

> an abuse-of-process claim is not dependent upon the resolution of the underlying
> criminal proceeding.  Instead, we have determined that such a claim accrues on
> the date of the allegedly tortious conduct.
>
> Further, although not briefed by either party, we have determined that the specific
> two-year statute of limitations in R.C. 2744.04(A) applies to abuse-of-process
> claims against political subdivisions and their employees.

*Read v. Fairview Park*, 764 N.E.2d 1079, 1082 (Ohio Ct. App. 2001).

Not surprisingly, the plaintiffs ask the Court to apply the four-year limitations period

referenced in *Yaklevich*, while the defendants urge the two-year period referenced in *Read*.  The defendants have the better of the argument, as they are public employees of Akron or Summit County.  In any event, it would not matter here which limitations period is applied.  Count Five is time-barred under either rule.

The Complaint makes clear that the plaintiffs had discovered that the criminal charge against Plaintiff was improperly tied by the defendants to the property taken from Metro in or by May 2017.  The Complaint alleges that defendants' willingness to pursue charges for the auto titles taken from Metro was made contingent upon Plaintiff pleading guilty or reaching a plea bargain in his criminal case.  Thus, the plaintiffs were informed and aware by May 2017 of the purported perversion of (i) the criminal legal process against Plaintiff and (ii) the criminal investigation process on behalf of Metro as the victim of an asset theft.

Ulterior motives here also were revealed and known.  Pam Brown apparently confessed to having transferred one of Metro's car titles herself.  (Doc. No. 1-1 at ¶ 23.)  She further revealed an ulterior motive of trying to force a plea bargain from Plaintiff as a prerequisite for taking action to recover Metro's property.  (*Id.* at ¶ 32.)  The Complaint also suggests that Plaintiff believed from early on that enmity from his uncle the police chief was in part responsible for Plaintiff's perceived persecution.  (*See id.* at ¶ 20.)

The abuse of process claims thus accrued by May 2017 at the latest.  (*See id.* at ¶¶ 29-32 & 34.)  In other words, the limitations clock was ticking since May 2017.

As discussed earlier in this opinion, the Complaint was not filed until August 31, 2021.  By that time, an abuse of process claim under Ohio law was time-barred.  The same conclusion would inhere regardless of whether plaintiffs had two years or had four years from May 2017 in which to file suit.

### D. Plaintiffs' Request to Amend the Complaint

Rule 15(a) indicates that leave to file an amended complaint should be "freely" granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). "A 'bare request' for amendment in an opposition to a motion to dismiss does not constitute a motion to amend," however. *Justice v. Petersen*, No. 21-5848, 2022 WL 2188451, at *3 (6th Cir. June 17, 2022); *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004) (citing *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000)).

Although leave to amend is generally given, "[a] court need not grant leave to amend . . . where amendment would be 'futile.'" *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 (6th Cir. 2005). Whether a proposed amendment is "futile" is governed by the standard applicable to a Rule 12(b)(6) motion to dismiss. *Id.* A court is within its discretion to refuse amendment and dismiss the complaint if it "concludes that the pleading as amended could not withstand a motion to dismiss." *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986); *see also Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745-46 (6th Cir. 1992).

Here, no amendment can change the Court's legal conclusions drawn from facts that plaintiffs pled and admitted in their Complaint and subsequent briefing.[4] By May 2017, the plaintiffs were informed (even threatened) of defendants' approach to Metro's taken auto titles and Plaintiff's criminal prosecution. By May 2017, Plaintiff reported to two government officials his view of the defendants' criminality and their collective effort to target both himself and his business Metro.

---

[4] "[T]he Sixth Circuit has held that 'pleadings withdrawn or superseded by amended pleadings are admissions against the pleader in the action in which they were filed.'" *PetroJebla, SA de C.V. v. Betron Enterprises, Inc.,* No. 19-11439, 2020 WL 95802, at *4 (E.D. Mich. Jan. 8, 2020) (quoting *Pennsylvania Railroad Company v. City of Girard*, 210 F.2d 437, 440 (6th Cir. 1954)).

The claims in the Complaint thus accrued by May 2017.  The limitations period ran by May 202, if not earlier.  That was prior to August 31, 2021, when plaintiffs filed this lawsuit. Amendment of the Complaint would be futile because those timeliness problems would endure.

### III. <u>Conclusion</u>

For the reasons stated above, the motion to dismiss is GRANTED.  The plaintiffs' request contained in their opposition brief for leave to amend the Complaint is DENIED.


**IT IS SO ORDERED.**


_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

**Date**: February 3, 2023